AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America

v.

DENIS GINCESCU; and
ION CEBOTAREAN,

Defendants

Case No.   2:23-mj-01001-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 1, 2023, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(3) | Possession of fifteen or more unauthorized access devices |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Abigail Tyrrell*
_____
*Complainant's signature*

Abigail Tyrrell, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____      _____
*Judge's signature*

City and state:   Los Angeles, California      Hon. Alka Sagar, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: David W. Williams (x8485)

**AFFIDAVIT**

I, Abigail Tyrrell, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Denis GINCESCU ("GINCESCU") and Ion CEBOTAREAN ("CEBOTAREAN") for a violation of 18 U.S.C. § 1029(a)(3) (possession of fifteen or more unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the United States Secret Service ("USSS"), in Los Angeles, California, as described in Attachment A-1:

a.    A Black Samsung retrieved from GINCESCU with IMEI 359914420801424 ("SUBJECT DEVICE 1"); and

b.    A Black Samsung retrieved from CEBOTAREAN with IMEI 359914420801473 ("SUBJECT DEVICE 2," and collectively with SUBJECT DEVICE 1, the "SUBJECT DEVICES").

3.    This affidavit is also made in support of a search warrant for a 2021 white Porsche Macan, bearing California license plate 8YWU004 and Vehicle Identification Number WP1AA2A56MLB15308 (the "SUBJECT VEHICLE") as described in Attachment A-2, registered to T.A.

4.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication

Features, and Information), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B.

5.   Attachments A-1, A-2, and B are incorporated herein by reference.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

7.   I am a Special Agent ("SA") with the United States Secret Service ("USSS") and have been so employed since 2017. As an SA with the USSS, I am a "federal law enforcement officer" empowered under the authority of 18 United States Code Section 3056.  I graduated from the Federal Law Enforcement Training Center in Glynco, Georgia and the U.S. Secret Service Special Agent Training Course in Beltsville, Maryland.  I have also attended numerous trainings and briefings on the conduct of criminal investigations involving financial crimes.

8.   My criminal investigative responsibilities include the investigation of Fraud and Related Activity in Connection with Access Devices (Title 18 United States Code, Section 1029) and other related offenses.  As a Special Agent, I have received training on how people use access devices to commit crimes and understand the law enforcement techniques that can be utilized to investigate and disrupt such activity.  I have gained experience conducting surveillance and reviewing evidence including financial records, and I have participated in investigations related to bank fraud, wire fraud, and money laundering.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.   Between August 2022 and January 2023, the California Department of Social Services ("DSS") has detected more than $38.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  Much of this fraud is from two specific programs known as CalFresh and CalWORKS, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

10.   For example, between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $117,000 was withdrawn from ATMs at a single financial institution branch located in Toluca Lake, California in Los Angeles County.  The unauthorized withdrawals conducted during these five days and at this single bank branch affected approximately 152 victim EBT cardholders.  The dates of these withdrawals coincided with the

disbursement by DSS of CalFresh and CalWORKs benefits to EBT cardholders.

11.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals from multiple accounts in quick succession at one ATM.

12.  On or about March 1, 2023, at approximately 4:30 a.m. (PST), law enforcement conducted physical surveillance at Wells Fargo ATM terminals located at 10221 Riverside Drive, Toluca Lake, CA 91602 ("Toluca Lake Front ATM") and 10225 Riverside Drive, Toluca Lake, CA 91602 ("Toluca Lake Rear ATM"), which were identified by DSS as top ATM locations for EBT fraud.

13.  During the course of that surveillance, law enforcement officials observed CEBOTAREAN and GINCESCU arrive in the SUBJECT VEHICLE.  CEBOTAREAN was dropped off at the Toluca Lake Front ATM terminal.  Meanwhile, GINCESCU drove around the building, exited the SUBJECT VEHICLE, and approached the Toluca Lake Rear ATM terminal.  At the ATM, law enforcement observed that GINCESCU inserted cards and entered PINs in rapid succession using approximately fifteen different access devices. Both individuals then returned to the parked SUBJECT VEHICLE, where they were arrested.  CEBOTAREAN was found to possess 4 access devices on his person, and GINCESCU was found to possess 17 access devices.  An additional 14 access devices were found in the SUBJECT VEHICLE.  SUBJECT DEVICE 1 was seized from

4

GINCESCU upon arrest, and SUBJECT DEVICE 2 was seized from
CEBOTAREAN upon arrest.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.   Regulatory Background of CalFresh and CalWORKs
Programs**

15.   DSS is a government agency that administers several
benefit and assistance programs for residents of the state of
California.  One of the assistance programs administered by DSS
is called CalFresh (formerly known as food stamps), which helps
low-income households purchase food and household items to meet
their nutritional needs.  Another assistance program
administered by DSS is called CalWORKs, which helps low-income
families with children pay for housing, food, and other
necessary expenses.

16.   Residents of California that meet the criteria
established by the CalFresh or CalWORKs programs can apply
online for benefits at www.getcalfresh.org and
www.benefitscal.com.  Beneficiaries apply for benefits by
submitting their income and number of dependents to determine
their benefit eligibility.

17.   CalFresh and CalWORKs benefits are issued through
Electronic Benefit Transfer cards ("EBT cards").  EBT cards are
mailed to an address designated by the account holder and
function like traditional debit cards to conduct transactions.

For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

18.  The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

19.  Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

20.  The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

21.  Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement

determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

22.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

23.  On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be coded with the EBT card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

24.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested

to clone cards is often obtained from what is colloquially referred to as "skimming activity."

25.   The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.   For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.   Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

26.   As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming.   Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

27.   In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area.   This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period

of time.  Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

28.  As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud.  Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.  As a result, law enforcement arrested approximately 16 suspects.  All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

29.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud

ATMs.  Law enforcement arrested three suspects that withdrew a
high volume of unauthorized withdrawals and that conducted those
withdrawals in rapid succession.  Two of those defendants came
to the ATM together, possessed 35 cloned EBT cards at the time
of arrest, and later analysis of historic ATM surveillance data
showed that they had made more than $190,000 in past attempted
fraudulent EBT withdrawals from a single bank since October
2022.  One additional defendant possessed 269 cloned EBT cards
at the time of arrest, and later analysis of historic ATM
surveillance data showed that the defendant had made more than
$70,000 in past attempted fraudulent EBT withdrawals from a
single bank since January 2023.  All three of these defendants
were determined to be citizens of Romania, who did not have
documentation to be lawfully present in the United States.  The
three arrested defendants were ordered detained pending trial by
the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal
grand jury returned two indictments against the three defendants
for bank fraud, in violation of 18 U.S.C. § 1344; aggravated
identity theft, in violation of 18 U.S.C. § 1028A; use of
unauthorized access devices, in violation 18 U.S.C. §
1029(a)(2); and possession of unauthorized access devices, in
violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-
CR-0077-JFW.

    **C.   Background of Current Operation to Combat EBT Fraud**

    30.  Data provided by DSS, based in part upon reported
fraud by victims, reported fraud to local law enforcement, bank
records, and surveillance indicates that as of in or about

January 2023, there has been approximately $71.3 million in
stolen funds from victim EBT cards.

31.  For the previous six months, between in or about
August 2022 and in or about January 2023, in the Central
District of California and elsewhere, more than approximately
$38.9 million has been stolen from victim EBT cards.  The
majority of these funds were stolen through unauthorized ATM
withdrawals.

32.  Between on or about January 1, 2023, and on or about
January 5, 2023, more than approximately $7.2 million was stolen
from victim EBT cards largely through unauthorized ATM
withdrawals.  Of the approximately $7.2 million stolen from
victim EBT cards in the beginning of January 2023, more than
approximately $2.9 million was stolen, almost entirely through
unauthorized ATM withdrawals, in Los Angeles County alone.

33.  For example, between on or about January 1, 2023, and
on or about January 5, 2023, more than approximately $117,000
was withdrawn from ATMs at a single financial institution branch
located in Toluca Lake, California in Los Angeles County.  The
unauthorized withdrawals conducted during these five days and at
this single bank branch affected approximately 152 victim EBT
cardholders.  The dates of these withdrawals coincided with the
disbursement by DSS of EBT benefits, including CalFresh and
CalWORKs.

34.  Based upon my training and experience conducting
access device fraud investigations, I know that suspects
committing access device fraud schemes will often target

particular BINs when harvesting stolen card information
collected from skimming devices.  Thus, suspects using skimming
may target the BIN associated with DSS, in essence, targeting
CalFresh and CalWORKs benefits.  Moreover, based upon my
training and experience, the sheer volume of unauthorized ATM
withdrawals occurring during the early days of the month is
further indicative that suspects participating in the fraud
scheme at issue are targeting EBT cards because benefits are
typically disbursed to EBT cardholders during the early days of
each month.

35.  Law enforcement has also reviewed ATM surveillance
provided by financial institutions that administer EBT accounts
that relate to the fraud scheme at issue.  During the
unauthorized ATM withdrawals, suspects can often be seen holding
stacks of cards and conducting withdrawals in quick succession
at one ATM.  Based upon my training and experience, I know that
suspects perpetrating access device fraud schemes will often
conduct unauthorized withdrawals using cloned cards in rapid
succession at ATMs.

36.  Based upon the rapid succession of unauthorized ATM
withdrawals being conducted, the fact that the cards being used
to conduct the unauthorized cash withdrawals are nearly all
cloned EBT cards, and the fact that nearly all of the
unauthorized withdrawals are happening during the early days of
the month, I believe that suspects participating in the fraud
scheme at issue are ostensibly targeting EBT cards.

    **D.**    **GINCESCU and CEBOTAREAN Possessed Unauthorized Access Devices on March 1, 2023**

37.  Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement conducted a surveillance and arrest operation in March 2023.

38.  On or about March 1, 2023, law enforcement was conducting physical surveillance at various bank and ATM locations throughout Los Angeles County, including Wells Fargo ATM terminals located at 10221 Riverside Drive, Toluca Lake, CA 91602 ("Toluca Lake Front ATM") and 10225 Riverside Drive, Toluca Lake, CA 91602 ("Toluca Lake Rear ATM"), which were identified as top ATM locations in Los Angeles for EBT fraud. Based on DSS fraud data, surveillance was conducted beginning at approximately 4:30 a.m.

39.  During this surveillance, law enforcement observed two unknown individuals, later identified as Denis GINCESCU and Ion CEBOTAREAN, arrive in the SUBJECT VEHICLE and approach the Wells Fargo Toluca Lake ATMs at approximately 8:10 a.m.  Law enforcement observed GINCESCU in the driver's seat of the SUBJECT VEHICLE and CEBOTAREAN in the front passenger seat.

40.  CEBOTAREAN exited the SUBJECT VEHICLE and approached the Wells Fargo Toluca Lake Front ATM, where law enforcement observed CEBOTAREAN at the ATM for approximately four minutes.

CEBOTAREAN then walked around to the back of the bank and entered the SUBJECT VEHICLE and waited in the vehicle for GINCESCU.

41.    After GINCESCU dropped CEBOTAREAN off near the Front ATM, he drove around to the back, parked, and exited the SUBJECT VEHICLE.  He approached the Wells Fargo Toluca Lake Rear ATM, and law enforcement observed GINCESCU insert cards into the Wells Fargo ATM in rapid succession for approximately ten minutes.  Law enforcement viewed the insertion of approximately fifteen cards into the ATM, each followed by brisk hand movements taking place towards the bottom of the ATM interface, where the pin code reader is located, followed by a few taps of the ATM interface screen.  GINCESCU appeared to be holding a stack of cards in his left hand, while switching cards and interfacing with the ATM using his right hand.  Based upon my training and experience, this pattern is typical of an individual who is checking a card balance or attempting to withdraw cash, and individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

42.    Based on their coordinated actions, and simultaneous use of two different ATMs at the rear and front of a single building, GINCESCU and CEBOTAREAN appeared to be cooperating with or assisting one another.

43.    Based on the date, time, ATM location, and after observing approximately fifteen transactions in rapid succession

-- and after observing both GINCESCU and CEBOTAREAN return to the SUBECT VEHICLE -- law enforcement approached the SUBJECT VEHICLE and detained GINCESCU and CEBOTAREAN in order to investigate further.

44.  GINCESCU had approximately 17 cloned cards in his wallet located in his front vest pocket.  CEBOTAREAN had approximately 4 cloned cards in his wallet located in his right pocket.  An additional 14 cards were located inside the SUBJECT VEHICLE between the front passenger door and seat.  In total, there were approximately 34 cloned cards.  The cloned cards consisted of a variety of re-encoded prepaid cards and gift cards.  They also had handwriting on the cards with what appeared to be, based on my training and experience, victim PIN numbers.

45.  Law enforcement confirmed these were cloned cards because the information contained on the card's magnetic strip did not match the information embossed on the front of the card.  Moreover, the cloned cards also had handwriting on the cards bearing victim PIN numbers that corresponded to each cloned card and were needed in order to conduct the unauthorized ATM withdrawals.

46.  Information obtained from Wells Fargo confirmed that three of the four cards in CEBOTAREAN's possession had been used at the Wells Fargo Toluca Lake Front ATM, while all seventeen of the cards in GINCESCU's possession had been used at the Wells Fargo Toluca Lake Back ATM.

47.   GINCESCU also had approximately $175 in cash in his wallet, and CEBOTAREAN had approximately $23 in cash in his wallet.

48.   ICE confirmed that GINCESCU and CEBOTAREAN are not lawfully present in the United States.  GINCESCU and CEBOTAREAN later confirmed to law enforcement during interviews that they were illegally in the United States and had entered via a boat from the Bahamas.  GINCESCU and CEBOTAREAN are both dual citizens of Moldova and Romania.  Additionally, the United States previously revoked GINCESCU's visa in February 2015.

49.   Based on my review of law enforcement database records, in October 2014, GINCESCU was arrested in Chicago for participating in a cash-out scheme with compromised credit cards that had come from Moscow.  In February 2015, GINCESCU pled guilty to a felony related to that conduct.  GINCESCU currently has an outstanding warrant for a probation violation alleged in connection with that case.

50.   SUBJECT DEVICE 1 was retrieved from GINCESCU's person and SUBJECT DEVICE 2 was retrieved from CEBOTAREAN's person.

51.   GINCESCU and CEBOTAREAN were arrested, read their Miranda warnings, and chose to speak with law enforcement.

52.   During GINCESCU and CEBOTAREAN's post-arrest interviews, they made the following statements, among others, in sum and substance:

a.   GINCESCU and CEBOTAREAN entered the United States illegally through Miami via a boat from the Bahamas.

b.   GINCESCU and CEBOTAREAN acknowledged the cards they possessed did not belong to them, that they were not authorized to use the cards, and that they knew what they were doing was fraudulent.

## V.   **TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

53.   Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.   It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.   Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and

often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.    Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

54.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICES as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GINCESCU and CEBOTAREAN's thumb and/or

fingers on the device(s); and (2) hold the device(s) in front of GINCESCU and CEBOTAREAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

57.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

58.  For all of the reasons described above, there is probable cause to believe that GINCESCU and CEBOTAREAN have committed a violation of 18 U.S.C. § 1029 (a)(3) (possession of fifteen or more unauthorized access devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES as described in Attachment A-1 and in the SUBJECT VEHICLE as described in Attachment A-2.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __2nd__ day of March, 2023.

_____
THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE